# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **FLEMMING, ZULACK AND WILLIAMSON, LLP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 04-2008 (RMC)** |
| | ) | |
| **DENNIS J. DUNBAR**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case presents a perfect example of why lawyers should always have clear retention agreements with their clients. Two law firms engaged in sloppy business practices and now one seeks to require payment from clients who had only the vaguest idea of what was going on. Flemming, Zulack and Williamson, LLP ("FZW")[1] sues under the equitable theories of *quantum meruit* and unjust enrichment to recover legal fees.

## I. FINDINGS OF FACT

This case was tried to the Court on December 11-12, 2007. From the record as a whole, including the trial testimony, exhibits, and witness demeanor, the Court makes the following findings of fact.

1.  Information Super Station, LLC ("ISS") was formed in 1997 by Dennis J. Dunbar. When Mr. Dunbar developed the idea of broadcasting live proceedings from the federal executive branch, he turned to his long-time corporate lawyer, Jim Hagerty,

---

[1] Since this litigation began, Flemming, Zulack and Williamson, LLP, became Flemming Zulack Williamson Zauderer LLP.

for help in obtaining investment capital.  Mr. Hagerty and/or Haig V. Kalbian, friend and future law partner of Mr. Hagerty, put Mr. Dunbar in contact with Bart S. Fisher and J. Patrick Dowd, partners in Capital House Merchant Banking, LLC.  Mr. Fisher and Ann Riley Dowd, wife of Mr. Dowd, invested in ISS and became "Members" of the LLC, with approximately 20% interest each.  Mr. Dunbar was the Managing Member of ISS and exercised exclusive authority to act for or bind ISS in the ordinary course of business.  Ann Riley Dowd acted by and through her husband, who was not a Member because of a prior conviction for perjury, which would have interfered with ISS federal licensing from the Federal Communications Commission.

2.      Pursuant to the ISS Operating Agreement, no Member was required to contribute additional capital or to have personal liability for any obligations of ISS.  The Agreement also provided that ISS "shall indemnify each Member for any act performed by the Member with respect to Company matters, except for willful misconduct or recklessness."  Def. Bart S. Fisher's Trial Ex. (hereinafter, "Def.'s Ex.") 1 (Amended and Restated Operating Agreement of Information Super Station) at 11 (§ 5.52).

3.      With direct assistance from Messrs. Fisher and Dowd, ISS and Ampex Corporation entered into a joint venture agreement in 1999 to broadcast events of the executive branch of the federal government over the Internet.[2]  As a result, Ampex invested

---

[2]  According to Edward Bramson, Chairman of Ampex, Mr. Dunbar first contacted him about investing in ISS by e-mail and then the two met in New York City.  Pl.'s Ex. 11 (Bramson Aff. ¶ 3, May 11, 2000).  Mr. Dunbar returned for a second meeting in March 1999, accompanied by Messrs. Dowd and Fisher, and the four men met again in Washington, D.C. in April 1999.  *Id.* ¶¶ 4-5.  Further contacts were limited to meetings between Mr. Bramson and Mr. Dunbar.  *Id.* ¶

more than $1,000,000 in ISS and its subsidiary, Executive Branch Webcasting Corporation ("EBWC").  The joint venture failed.  ISS became concerned that Ampex was stealing ISS's intellectual property and retained Haig V. Kalbian & Associates to sue Ampex.  Pursuant to this representation, in December 1999, ISS signed a written fee agreement with Haig V. Kalbian & Associates ("Kalbian & Associates") for legal services at a rate of $260/hour for partner time and $185/hour for associate time.  Def.'s Ex. 3.

4.      A lawsuit was filed on January 7, 2000, naming Ampex and two of its principals as defendants.  That complaint was never served; instead, Kalbian & Associates filed a First Amended Complaint on February 10, 2000[3] (the "D.C. Litigation").  However, on or about February 1, 2000, Ampex had filed its own lawsuit in New York against ISS and EBWC (the "New York Litigation").  Ampex also named Messrs. Dunbar, Fisher and Dowd as defendants.

5.      In February 2000, Kalbian & Associates became Kalbian & Hagerty, LLP ("KH"), which continued to operate as ISS's counsel.  In that same month, KH retained FZW to serve as local counsel for the New York Litigation.  This was casually accomplished by Mr. Kalbian merely calling a friend from college, Jim Lynch of

10.

[3]  According to the retention agreement between ISS and Kalbian & Associates, the parties "agreed that a Complaint will be filed by year-end, however, this pleading will not be served on the defendants.  We agreed that we would use the next two weeks or so to draft a First Amended Complaint.  This pleading will, hopefully, include all potential defendants and all possible causes of action arising from the failed joint venture between ISS and Ampex/iNEXTV."  Def.'s Ex. 3.

FZW, and asking him to be local counsel.  On February 15, 2000, Mr. Kalbian forwarded the summons and complaint to Mr. Lynch and indicated that an associate at KH would prepare a motion to transfer the New York Litigation to the District of Columbia based on *forum non conveniens*.  Mr. Lynch assured Mr. Kalbian that FZW could readily draw up, from forms in its computer files, such a motion and file it quickly.  Thus, it was agreed that the work would be done in New York.

6.      On February 23, 2000, Mr. Kalbian sent a letter to Mr. Dunbar, with regard to a strategy for the New York Litigation that had been laid out in an e-mail (not in evidence) dated February 17, 2000.  He promised to forward courtesy copies of all filings and recent correspondence.  Mr. Kalbian asked Mr. Dunbar to deposit an additional $25,000 on account with KH because:

> I expect March to be as busy as February in light of the New York filing and our plans to seek dismissal or a stay of that case.  Jim Lynch, our New York local counsel, advises that the Court will likely schedule a hearing that will involve travel to New York.  While Jim's firm has done very little to date, I also expect his firm to play an expanding role over the next few weeks.  Therefore, the $25,000 is reasonable in terms of expected activity in the immediate future.

> Def.'s Ex. 5 (Feb. 23, 2000 Letter from Haig V. Kalbian to Dennis Dunbar at 1-2).

7.      Neither Mr. Kalbian's letter to Mr. Lynch nor his letter to Mr. Dunbar was sent to Messrs. Fisher or Dowd.

8.      On April 11, 2000, Mr. Hagerty sent a fee statement from KH to Mr. Dunbar.  His cover letter noted:

> I have also enclosed an invoice from our local counsel in New York, Flemming, Zulack & Williamson, LLP[,] for the amount of

$5,452.82.  You will find this amount listed on your March 2000 invoice Kalbian Hagerty invoice [sic] as a local counsel fee.  I will reimburse the attorneys at Flemming, Zulack & Williamson for their time.

Def.'s Ex. 8 (Apr. 11, 2000 Letter from James R. Hagerty to Dennis J. Dunbar at 1).

Again, this letter went only to Mr. Dunbar; Messrs. Fisher and Dowd were not copied or alerted.  No money was sent to FZW.

9.    Six "timekeepers" at FZW, with hourly rates ranging from $170 to $335, threw themselves into the research and preparation of a motion to dismiss or transfer the New York lawsuit brought by Ampex.  This was a complicated legal maneuver, trying to persuade a federal district court to transfer the case to the Superior Court of the District of Columbia, and it generated several filings by lawyers for both sides on that procedural issue, without ever touching the merits of the underlying dispute between the joint venture partners.  During March 2000, FZW timekeepers amassed a bill of $60,476.75 in fees and $778.98 in expenses.  A fee statement to this effect was sent by Mr. Lynch to Mr. Kalbian on May 2, 2000 ("FZW March Bill").  Def.'s Ex. 9.

10.   The lawsuit filed by KH in D.C. was dismissed and immediately appealed.  The motion to transfer the New York case to D.C. was filed by FZW on April 4, 2000.

11.   When, on May 11, 2000, Mr. Hagerty sent a legal bill to Mr. Dunbar, he made no mention of the FZW March Bill.  He said only:

Note that there is a previous balance due on the . . . Ampex Litigation account for $19,656.11[,] which brings the total balance[] due on [this] account[] to . . . $20,940.05 . . . .  Also note that $5,452.82 of the balance due for the Ampex Litigation includes the February

invoice from our New York counsel, Flemming, Zulack & Williams
[sic].

Def.'s Ex. 10 (May 11, 2000 Letter from James R. Hagerty to Dennis J. Dunbar at

1).  Again, no copy of this letter was sent to Messrs. Fisher or Dowd.

12.     Perhaps this is no surprise because there had been a meeting of the ISS Board of

Directors, which included Mr. Fisher and Ms. Dowd, in March 2000, at which time

Mr. Hagerty asked Messrs. Fisher and Dowd to make further capital contributions to

ISS to pay for attorney fees in the two ISS/Ampex cases or to otherwise share in the

cost.  Both men refused.  Mr. Fisher and Ms. Dowd were thrown out of the room and

they were thrown out of the corporation without compensation for their shares.  Mr.

Hagerty had suspiciously little recollection of this dramatic meeting when he

appeared in court to testify.

13.     On June 15, 2000, Mr. Hagerty sent Mr. Dunbar a billing statement for May 2000,

with copies of previous invoices that remained unpaid.  This time, Messrs. Fisher and

Dowd were copied.  However, Mr. Hagerty again flinched on forwarding the FZW

March Bill.  He wrote: "Included in the Ampex invoice is a single fee for $5,542.82

from our New York local counsel which represents February time only.  We expect

to receive additional invoices from New York soon in amounts greater than the

current amount *Kalbian Hagerty currently owes the local counsel.*"  Def.'s Ex. 11

at 1 (emphasis added).  Mr. Hagerty also referred to the March meeting and the

"discussion regarding our legal fees and the willingness of ISS and its members to

fund the Ampex litigation.  Pat Dowd was particularly vocal about the amount of the

hourly rates you agreed to pay us at that meeting." *Id*. at 1-2.  Mr. Hagerty offered a 15% reduction in fee rates in exchange for "ISS (and its members) pay[ing] us the entire amount due now as well as commit[ing] to pay all future invoices within ten days of receipt." *Id*. at 2.  Because KH was treating the FZW bills as "reimbursable expenses" on its own bills to ISS, fully paying KH would, in theory, also fully pay FZW.

14.     Neither Mr. Fisher nor Mr. Dowd ever accepted the proposal that they personally contribute funds for the legal fees.

15.     On June 21, 2000, FZW submitted its invoice for fees and expenses for the months of April and May, plus additional time for March, in the total amount of $18,283.57.  KH sent ISS its own invoice for June 2000 on July 13, 2000, with a line item under reimbursable expenses for FZW's June 2000 invoice but Mr. Hagerty again omitted mention of the fees and expenses for the FZW March Bill.

16.     At an unspecified time, Mr. Bramson from Ampex contacted Mr. Fisher and initiated negotiations to end the litigation between Ampex and ISS.  Mr. Fisher negotiated a settlement of both the D.C. and the New York lawsuits, which Mr. Hagerty then drafted.  FZW reviewed the Settlement Agreement before it was executed.

17.     ISS and Ampex executed the Settlement Agreement on July 19, 2000, whereby the lawsuits were dismissed with prejudice in exchange for $200,000 paid by Ampex to the IOLTA Trust Account at KH on behalf of the "ISS Group," *i.e.*, ISS, EBWC, and Messrs. Dunbar, Fisher and Dowd.  Def.'s Ex. 14.

18.     FWZ sent another invoice to KH on July 20, 2000, covering the months of June and

July in the amount of $7,432.76.  The total outstanding due to FWZ, as reflected on the July 20 invoice, was $92,468.42.  FWZ was finally getting anxious about getting paid; Jim Lynch called Mr. Kalbian about it and then faxed him copies of the bills (which had been handled to that point by Mr. Hagerty).

19.    Mr. Kalbian wrote to Mr. Lynch about the FWZ bill on July 26, 2000, in what appears to be the first written communication about the FWZ March bill and the second time the two had discussed it.  This letter stated:

> When we spoke last week, I thought you would send me the bill, with the adjustment that we discussed for the $60,000 bill we received earlier this year.  The outstanding balance of $92,468.42 still reflects the unadjusted amount.
>
> Jim, I would like to bring this matter to closure as quickly as possible.  There was clearly a misunderstanding but the truth remains that we were told by either Kanter or Eisenberg that this was a two day job and that it would be more cost effective for your firm to do the papers since you had many samples in your computer files.  We relied on that and I gave Libby the green light to have you guys work on the brief.  Needless to say, we were absolutely shocked at the size of the bill – especially Eisenberg's mind boggling 100 plus hours.
>
> As I told you, Jim Hagerty and I think that a 50% discount on that bill is very fair. . . .
>
> The Ampex case has settled and I am sitting on some funds in our Trust Account.  I will have Jim Hagerty issue you a check for $25,000 on account this week and look forward to receiving some word from you on the discount.
>
> If you tell me that a discount is out of the question, I will have no choice but to present the bill, as is, to ISS.  They will then need to pay you over time because they are in no position to pay $90,000 at this time.
>
> Def.'s Ex. 18 at 1-2.

20. At this point, none of the named Defendants in this action – EBCW, Dennis Dunbar

and Messrs. Fisher and Dowd[4] – had any idea that a $60,000 fee statement for FZW's

work in March 2000 was outstanding.

21. By letter dated August 30, 2000, Mr. Kalbian sent a check to Mr. Lynch at FZW in

the amount of $10,000.  He also asked Mr. Lynch to:

> confirm to me FZW's willingness to adjust the bill in line with our
> discussions last month.   Also at this point, ISS is struggling
> financially but is likely to 'turn the corner' in September or October
> when it expects to close on a deal with the GSA.  It has other 'coals
> in the fire' as well.  The client is aware of its obligation to your firm
> and appreciates your efforts in New York.  As its finances allow, it
> will continue to pay down its obligations to FZW.  Again, it would
> help me greatly if I could inform ISS of the adjusted amount.

Def.'s Ex. 19 at 1.

22. Mr. Lynch responded on October 26, expressing his "considerable frustration and

embarrassment" because the ISS fees had been outstanding for so long.  He offered

to recommend a $15,000 reduction to the FZW billing committee in exchange for full

payment within 30 days, concluding with the plea that Mr. Kalbian "use [his] good

offices with ISS to quickly bring this matter to resolution."  Def.'s Ex. 24 at 1.

23. ISS issued a check to FZW on November 30, 2000, in the amount of $15,000, signed

by Mr. Dunbar.  The check bounced.

24. Mr. Lynch sent a Promissory Note to Mr. Kalbian on February 6, 2001, in the amount

of $82,746.04 "to be signed by Information Super Station, LLC and Dennis J.

Dunbar."  Def.'s Ex. 29.  There is no indication in the record that this Promissory

---

[4] Default judgments have been entered against EBCW and Mr. Dunbar.  *See* Dkt. # 37.

Note was ever executed.

25.     By Mr. Hagerty, KH sent ISS its February 2001 invoice on March 15, 2001.

        Amazingly, this letter contained a handwritten P.S. that said, for the first time since

        the FZW March Bill had accrued one year earlier, "in addition to the above we have

        a large local counsel bill to settle, which I would like to discuss with you in due

        course." Def.'s Ex. 30.

26.     FWZ wrote to Mr. Dunbar directly on July 30, 2001, sending copies of all FZW

        invoices that had been sent "to your company through its attorneys and agent,

        Kalbian Haggerty [sic]." Def.'s Ex. 31 at 1. Mr. Stein of FWZ indicated that "[o]ur

        patience has worn out" and demanded to know by August 10, 2001, "how and when

        you intend to pay the outstanding balance of $82,765.16." *Id.* FZW filed suit in the

        Southern District of New York on August 17, 2001, demanding $82,765.16, plus

        interest, from ISS, and $15,000 from either Mr. Dunbar, Mr. Dowd or Mr. Fisher,

        depending on who had signed the check that bounced. Def.'s Ex. 32.

27.     Despite the different relief sought, the District Court in New York entered a default

        judgment against all named defendants for the full amount sought against ISS. FZW

        docketed the judgment in D.C. and began enforcement measures, in 2002, garnishing

        Mr. Fisher's law firm partnership account. The garnishment was the first time Mr.

        Fisher received indication that FZW expected payment from him for its fees arising

        from the New York Litigation. His attorney argued that the default judgment had

        deficiencies that rendered it invalid. By stipulation, FZW withdrew its suit.

27.     When Mr. Fisher received notice of the attempted garnishment in August 2002, he

-10-

faxed it to Mr. Hagerty, with a cover note that said:

> I just received the attached. As I indicated in my phone message to you, I did not know all this was going on. I thought Dunbar had counsel, had taken care of it, or that you were in the middle of some type of bargaining deal with them, and that you thought their legal fees were excessive.
>
> What am I missing in this picture, other than the usual Dunbar idiocy? First, he takes my $230K as an investor in ISS, which gives me 23% of ISS. He then throws me out of ISS, with no compensation to date, or probably ever. Now with no ownership interest in ISS, I am expected to pay the legal bills for the investment he now says I own no part of. . . . Since you got me in[,] get me out. At least settle this matter with the law firm you guys got in the middle of the picture. I will pay my fair share, and that may include taking over all of ISS to make it work.

Def.'s Ex. 33.

28.   Mr. Kalbian responded on September 9, 2002, sending copies of all of the FZW bills and a cover note saying that he "hope[d] these are of assistance in achieving a settlement negotiation." Def.'s Ex. 34. Mr. Kalbian included the FZW March Bill, which had still never been presented to ISS by KH.

29.   In early November 2002, FZW's litigation counsel learned that KH had received a payment of $200,000 from Ampex from which "they paid themselves, disbursed [the] balance to Dunbar, and left FZW (as well as Fisher and Dowd) out in the cold." Def.'s Ex. 35 at 2. Challenged by this information, Mr. Kalbian sent a long e-mail to Mr. Lynch, complaining about the amount of the FZW March Bill and insisting that both KH and FZW received checks in the amount of $10,000 from the Ampex settlement but that most of it went to a secured creditor so that ISS could avoid bankruptcy "where none of us would get paid. Keep in mind that you guys had

-11-

Fisher and Dowd on your hook.  These guys were not our clients in the DC litigation. . . . [Please] do not measure my good faith by the sleaze that is Fisher and Dowd." *Id*. at 1-2.  This message was not quite accurate.  KH disbursed $15,089 to itself from the account; $41,976 to Mr. Dunbar; $10,000 to FZW; and $111,439.00 to the secured creditor.

30.     FZW re-filed its collection suit on January 20, 2004, in New York.  This time, it alleged that Messrs. Dunbar, Fisher and Dowd, as well as EBWC, were all liable for the full amount of its unpaid fees.  The suit was transferred to the District of Columbia on November 5, 2004.  Default judgments have been entered against Mr. Dunbar and EBWC.

## II.  LEGAL STANDARDS

### A.     Choice of Law

Where there is diversity of citizenship among the parties, as here, the applicable choice of law rules are those of the forum state.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Samra v. Shaheen Bus. & Inv. Group, Inc.*, 355 F. Supp. 2d 483, 496 (D.D.C. 2005).  Under D.C. law, the first step in a choice of law analysis requires that the Court determine whether there is any conflict among the potentially applicable legal standards.  *Young Women's Christian Assoc. of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada*, 275 F.3d 1145, 1150 (D.C. Cir. 2002).  Only if the potentially applicable standards are in conflict does the Court need to apply D.C.'s choice of law rules to determine which standard(s) govern the case.  *Id*.  If a conflict exists, D.C. law provides that the law of the jurisdiction having the "'more substantial interest' in the resolution of the issues" will govern.  *Id*.; *Owen v. Owen*, 427 A.2d 933, 937 (D.C. App. 1981).

"[O]f the greatest importance for the choice of law inquiry, however, is the place where the parties were to perform their respective obligations under the agreement." *Samra*, 355 F. Supp. 2d at 499 (citing *Frank E. Basil, Inc. v. Guardino*, 424 A.2d 70, 77 n.12 (D.C. 1980)).  The parties disagree whether D.C. or New York law ought to apply.

Choice of law matters in this case because the jurisdictions differ on their approach to *quantum meruit* and unjust enrichment claims.  Under New York law, "quantum meruit and unjust enrichment [are analyzed] together as a single contract claim."  *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citing *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 768 F. Supp. 89, 96 (S.D.N.Y. 1991) (explaining that 'quantum meruit and unjust enrichment are not separate causes of action,' and that 'unjust enrichment' is a required element for an implied-in-law, or quasi-contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract.")).  Under D.C. law, *quantum meruit* and unjust enrichment are separate claims.  "An action in quantum meruit is an action on a contract implied in fact . . . . An unjust enrichment action, on the other hand, involves a quasi-contract, a contract implied in law."  *See Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 10-11 (D.D.C. 2006) (citing *4934, Inc. v. Dist. of Columbia Dep't of Empl. Servs.*, 605 A.2d 50, 55 (D.C. 1992)).

Here, the litigation at question, the New York Litigation, was filed in the U.S. District Court for the Southern District of New York by a New York corporation and a Delaware corporation, against two businesses operating in D.C., one resident of D.C., one resident of Virginia, and one resident of Maryland.  It concerned the failure of a joint venture which was to have operated in D.C.  The agreement had been partly negotiated in New York and partly negotiated in Washington, D.C.  The joint venture document was signed on July 7, 1999, but the locus of the signatories is not

revealed in the record; by its terms, New York law was to apply to any disputes.  *See* Def.'s Ex. 2 at 18 (Joint Venture Agreement § 10.1).  However, the various jurisdictional questions that might have surrounded the New York Litigation do not control the analysis in the instant matter.

For purposes of this case, what matters is that FZW was contacted in its New York office by KH and asked to act as local counsel.  As far as the record reveals, no one from FZW ever traveled to D.C. and no one from D.C. ever traveled to New York in connection with the New York Litigation.  KH anticipated that its associates would draft the papers and FZW would file them; the idea was to transfer the New York suit to Washington, where the earlier-filed D.C. Litigation was pending in D.C. Superior Court.  FZW convinced KH that it had motions to transfer already in its computer system and could readily – and inexpensively – modify one of those to get the job done quickly.  Therefore, the work was done in New York.[5]  Both pieces of litigation were eventually settled without the active involvement of FZW; it only reviewed the settlement papers that were drafted by KH in D.C.

On these facts, the Court concludes that New York has the greater interest in this suit for fees: The underlying New York Litigation  was filed in New York, based on an agreement over which New York law applied; FZW was contacted in New York and agreed to be local counsel; FZW lawyers performed all their work in New York; and FZW sent its fee statements to KH from New York.  New York law will be applied.

### III.  ANALYSIS

FZW relies on two ancient theories of the common law to recover the entirety of its

---

[5]   Since the D.C. Litigation was pending in D.C. Superior Court, the motion to transfer asked the New York federal court to transfer the case to a state court, a more complicated request than a transfer from one federal court to another.

fees, jointly and severally, from Messrs. Fisher and Dowd.  These theories are necessary because FZW had no written or oral contract with either man to represent him.  Each theory will be addressed in turn.

### A.    Quantum Meruit

The Latin phrase, *quantum meruit*, means, literally, "as much as he has deserved." *See* Black's Law Dictionary (8th ed. 2004).  In the absence of an actual contract, written or oral, *quantum meruit* establishes the legal fiction that there was an enforceable contract.  *See, e.g.*, *Wehrenger v. Stork*, 168 A.D.2d 242 (N.Y. App. Div. 1st Dep't 1990).  In order to recover on a claim sounding in *quantum meruit*, a plaintiff must demonstrate: (1) the performance of services in good faith; (2) the acceptance of those services by the person(s) to whom they were rendered; (3) an expectation of compensation from the person(s) to whom services were rendered; and (4) a reasonable value of the services in question.  *See Landcom, Inc. v. Galen-Lyons Joint Landfill Comm'n*, 259 A.D.2d 967 (N.Y. App. Div. 4th Dep't 1999); *see also Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 148 (2d Cir. 1998).

The record is clear: FZW performed its services in good faith, even if it violated sound business practices by not assuring its direct retention by the erstwhile clients; all defendants in the New York Litigation, including Messrs. Fisher and Dowd, accepted those services; and the Court assumes, for these purposes, that the amount claimed is reasonable.  However, the record is equally clear that FZW never expected payment from either Mr. Fisher or Mr. Dowd.  Based on this record, the Court concludes that FZW did not have a "reasonable expectation" of payment from Messrs. Fisher or Dowd and, therefore, cannot recover in *quantum meruit*.  *Topo v. Dhir*, No. 01-10881, 2004 U.S. Dist. LEXIS 4134, at * 12 (S.D.N.Y. Mar. 16, 2004) ("The question of whether

a party had a reasonable expectation of compensation for services rendered is a matter for the trier of fact to determine based on the evidence before it.").

First, FZW *never* communicated – during the representation or at any time afterward – with either Mr. Fisher or Mr. Dowd, until it sued ISS in August 2002 and named both men as defendants because FZW could not read the signature on the bounced $15,000 check from ISS. Second, that first collection suit in New York sought only $15,000, in the alternative, from *either* Mr. Dunbar *or* Mr. Fisher *or* Mr. Dowd, depending on who had signed the check; FZW only looked to its corporate client, ISS, for payment of its fees. Third, throughout the active representation and for more than a year afterwards, FZW sent its fee statements only to KH and entreated only KH to obtain payment *from ISS*. This was the practice from February 2001 until mid-summer 2002, when Mr. Stein finally sent the statements directly to Mr. Dunbar at ISS; even so, no statement or notice was sent to either Mr. Fisher or Mr. Dowd. Fourth, Mr. Lynch attempted to obtain signatures from ISS and Mr. Dunbar on a Promissory Note in early 2002, but not from Mr. Fisher or Mr. Dowd. Fifth, neither Mr. Fisher nor Mr. Dowd ever received copies of pleadings as they were filed, as did Mr. Dunbar. Sixth, Mr. Fisher received a copy of the fee statements *from Mr. Kalbian* but never received them from FZW. Seventh, Mr. Dowd never received copies of the fee statements at all until they showed up in this litigation. Eighth, the record strongly suggests that FZW only tumbled to the idea of suing Messrs. Fisher and Dowd when it was suggested to them by Mr. Kalbian, as KH tried to untangle itself from any liability.[6]

---

[6] FZW relies on testimony from Messrs. Kalbian and Hagerty that they were authorized to represent Messrs. Fisher and Dowd in the New York litigation. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law [Dkt. # 64] at 4-5 ¶¶ 7-11. The argument fails for lack of support. The Restatement of Agency defines agency as "the fiduciary relationship that arises when one person ("a principal") manifests assent to another person ("an agent") that the agent shall act on

On this record, the Court cannot find that FZW ever reasonably expected its fees to be paid by either Mr. Fisher or Mr. Dowd.  It certainly never acted that way, until this suit was filed in 2004, three years after the representation at issue.  FZW erred by not getting a signed retention agreement from its putative clients, but that is a flaw that State Bar rules no longer permit.[7]  KH has less excuse for its actions.  KH received the FZW March Bill but *never* sent it to ISS or Mr. Dunbar.  KH was not direct with either its clients – ISS, EBCW and Mr. Dunbar – or its co-counsel, FZW.  KH never advised FZW of the dire financial condition of ISS and EBCW, although there is no doubt that Mr. Hagerty was fully aware of that condition.  It took KH months just to speak with FZW about the FZW March Bill.  FZW now relies on what discovery has revealed: that Mr. Hagerty and Mr. Dunbar attempted to get further capital from Messrs. Fisher and Dowd in March 2000 to pay its fees, as if notice from them that ISS was in financial distress were equal to FZW's own reasonable expectation that payment would come from either man.  It just does not compute.

Surely, as FZW argues, both Messrs. Fisher and Dowd were aware that someone (only Mr. Fisher knew that it was FZW, as Mr. Dowd had moved to France) was defending ISS and all

---

the principal's behalf and *subject to the principal's control*, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01 (2006) (emphasis added).  The burden of proof for establishing the existence of an agency relationship rests with the party asserting it.  *Id*.  Testimony from Messrs. Kalbian and Hagerty does not establish the requisite "assent" or "consent" by the principal in an agency relationship.  As explained *infra*, each Defendant reasonably relied on the indemnity provision in the ISS Operating Agreement to protect his own purse and did not anticipate that FZW would seek fees from them.  Moreover, Messrs. Kalbian and Hagerty both proved themselves very questionable witnesses, and Mr. Kalbian exhibited clear hostility to Messrs. Fisher and Dowd.  Messrs. Kalbian and Hagerty both had extraordinarily useful episodes of forgetfulness as witnesses, which undercut their entire testimony, leaving great gaps in retelling critical events.

[7] Since 2002, attorneys practicing in the state of New York are required to adhere to the provisions of 22 N.Y.C.R.R. § 1215.1 which requires attorneys to enter into written letters of engagement or retainer agreements with clients.

defendants in New York.   However, each man reasonably relied on the indemnity provision in the ISS Operating Agreement to protect his own purse.[8]  In sharp contrast, FZW cannot show a single action on its part that would have alerted either Mr. Fisher or Mr. Dowd that FZW reasonably anticipated that it could seek its fees from them.  Until this exact suit was filed, every action the firm took was in another direction.

The *quantum meruit* claim must be dismissed.

**B.     Unjust Enrichment**

Under New York law, an unjust enrichment claim must contain the following elements: (1) the defendants were enriched; (2) enrichment was at the plaintiff's expense; and (3) the defendants' retention of the benefit would be unjust.  *Dubai Islamic Bank v. Citibank*, 126 F. Supp. 2d 659, 669 (S.D.N.Y. 2000).

Here, again, FZW has clearly demonstrated that the Defendants were enriched at its expense.  The remaining question is whether equity and good conscience require these Defendants to make FZW whole.  As Mr. Dowd wrote, *pro se*:

> Mr. Kalbian, a spin master if there ever [were] one, wrote a highly misleading letter to his college friend, Jim Lynch of Flem[m]ing Zulack, labeling Fisher and Dowd "sleazes" and "deadbeats" for not paying a legal bill that:
>     a) he was challenging on its merits
>     b) had not been conveyed to ISS

_____

[8]  Mr. Dowd was not a member of ISS, his wife was.  FZW legitimately challenges his right to rely on the indemnity clause in the ISS Operating Agreement.  The record is clear that Ann Reilly Dowd was the member of ISS but that Mr. Dowd regularly acted in her stead and was accepted in that role.  Certainly Mr. Fisher's claim to indemnification is more clear than Mr. Dowd's, but, given the complex relationships and business practices of ISS, the Court cannot say that Mr. Dowd's expectations were unreasonable.

> c) had not been conveyed to Fisher and Dowd[9]
>
> d) had not been paid even though Kalbian Hagerty had $200,000 in its custody to meet ISS financial obligations
>
> e) had arisen in the course of business in a company from which [Messrs. Fisher and Dowd] had been expelled with Kalbian and Hagerty's full knowledge.

Pro Se Def. Dowd's Resp. to Findings of Fact and Conclusions of Law Presented by Flemming, Zulack & Williamson and Quagliano & Seeger [Dkt. # 66] at 2.

There are two troubling aspects that affect whether, in equity and good conscience, FZW should recover from Messrs. Fisher and Dowd. As an initial matter, FZW knew, from its review of the Ampex/ISS Settlement Agreement, that KH had put $200,000 in settlement monies into its Trust Account from the very lawsuit on which FZW performed, but FZW did nothing to pursue its right to some of those monies (the record shows no phone call, no e-mail, no legal action). In fact, despite Mr. Kalbian's July 26, 2000, letter warning that KH was "sitting on some funds in our Trust Account," Def.'s Ex. 16, FZW did not act to collect on bills that were months old and that had, in part, produced those very funds. Further, Mr. Kalbian sent a single check for $10,000 in late August 2000 (the only payment FZW ever received), and warned that "ISS is struggling financially." Def.'s Ex. 19. When Mr. Lynch finally responded on October 26, 2000 – offering to attempt to persuade FZW to agree to a $15,000 reduction in the fees – the Trust Account monies had been depleted. It is not clear on this record exactly what transpired thereafter. Mr. Dunbar issued the $15,000 check in November 2000 that bounced. Mr. Lynch sent a Promissory Note to Mr. Kalbian,

---

[9] By the time Mr. Kalbian suggested that FZW sue Messrs. Fisher and Dowd, he had forwarded the FZW bills to Mr. Fisher, but not Mr. Dowd. FZW never sent any pleadings or bills to either man.

for ISS and Mr. Dunbar[10] to sign, in February 2001, apparently without success.  And FZW finally wrote directly to Mr. Dunbar in July 2001, expressing its lack of patience and intent to sue. Whatever conversations or communications occurred among Messrs. Kalbian, Hagerty and Lynch during this time period remain a mystery.  At trial, Messrs. Kalbian and Hagerty could not remember critical facts and details concerning events with which they were directly involved, which made their entire testimonies questionable.  FZW never called Mr. Lynch to testify and never clarified when he left the firm.  While Mr. Lynch is no longer a partner at FZW, it remained FZW's burden to prove by a preponderance of evidence that it deserved to collect from Messrs. Fisher and Dowd in equity. The lack of testimony by Mr. Lynch to explain the inaction of the firm at critical times leaves a big hole in its proofs.

The second troubling aspect of FZW's equitable claim is that in its first collection effort, FZW sued ISS for its fees and only sued Messrs. Dunbar, Fisher and Dowd for $15,000, in the alternative, depending on who had signed the bounced check, and *not* for its fees.  When, however, the court granted default judgment against all defendants in that suit for the full amount of fees, FZW attempted to register the judgment in D.C. and execute it – for the full amount of outstanding fees – against Mr. Fisher individually.  FZW knew that its judgment was in error: it had not sued Mr. Fisher (or any individual) for the full amount of its fees, but it sought to use the judgment as if it had.  While the Court has sympathy with the firm's desire to get these longstanding bills paid, FZW comes into court with a blotch on its escutcheon.[11]

---

[10]  Notably, FZW did not seek signatures from either Mr. Fisher or Mr. Dowd.

[11] *See Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 107 (explaining that it is a fundamental principle of equity that "he who comes into equity must come with clean hands.") (2d Cir. 2000).

The New York Litigation was part of a two-court dance whereby ISS and Ampex sought to break up their ill-fated joint venture, each side accusing the other of skullduggery.[12]  The lawyers engaged in a fierce but short round of procedural arguments[13] that had absolutely nothing to do with the merits.  While Mr. Fisher and Mr. Dowd were not mere bystanders to the facts underlying the New York Litigation, there was no argument made by Ampex or FZW that was particular to either man, and, despite FZW's claim to the contrary, no indication that the quality of its arguments led to the settlement.[14]

FZW argues that Defendants' "*sole* excuse for failing to pay for FZW's services was that they assumed that pursuant to ISS' operating agreement, ISS would pay for their legal fees."  Pl.'s Proposed Findings of Fact and Conclusions of Law at 16.  This is not quite right.  Under the operating agreement, ISS was obligated to pay Mr. Fisher's legal fees and, as discussed above, Mr. Dowd had a reasonable expectation that ISS would pay his fees as well.  The arguments advanced by FZW that the indemnity provision was inapplicable are not persuasive; while it might have excluded "willfull misconduct or recklessness," [sic] and the Ampex complaint might have alleged

---

[12]  Naivete seems the more likely noun, given the rapidity with which Mr. Dunbar managed to run through everybody else's money with nothing to show for it.

[13]  FZW states that it provided an aggressive defense for six months before the New York Litigation settled.  This exaggerates the record.  FZW only broke a sweat in the month of March 2000; in every other month, it essentially babysat the case.

[14]  Mr. Bramson called Mr. Fisher to initiate settlement of the Ampex/ISS litigation.  As relevant here, those discussions led to a settlement drafted by KH and reviewed by FZW.  At that point, the D.C. Litigation had been dismissed and was on appeal and the motion to transfer in the New York Litigation had not been decided.  However, without an ongoing suit in D.C., the chances of the motion to transfer the New York suit to D.C. faced an uphill battle.  Thus, the role of FZW in obtaining a settlement – except for showing that the matter would be hard-fought and expensive – remains unclear.

that Messrs. Dunbar, Fisher and Dowd engaged in wilful or reckless misconduct, the allegations in

a complaint do not govern the interpretation of the operating agreement.

## IV.  CONCLUSION

FZW brings its complaint in equity but without totally clean hands.  Messrs. Fisher

and Dowd were ejected from ISS in March 2000 without compensation and had no role in ISS

thereafter, although the settlement was not achieved until July.  The settlement figure of $200,000

was known to FZW, which sat on its hands.  The record gives no indication that either Mr. Fisher

or Mr. Dowd knew of that amount or had any claim on it.  FZW and KH played fast and loose with

their "housekeeping" obligations to enter into retention agreements with their clients, share pleadings

with clients, and otherwise conduct themselves as if FZW expected each named defendant in the

New York Litigation to pay its fees.  Under these circumstances and the entire record, the Court finds

that FZW should bear the greater burden of absorbing its fees.  Messrs. Fisher and Dowd will be

ordered, jointly and severally, to pay FZW only those fees incurred in February 2000 before they

were ejected from ISS, *i.e.*, $5,452.82.[15]  Whether FZW has a claim against KH is not for this Court

to say.  A memorializing order accompanies this Memorandum Opinion.


_____/s/_____
ROSEMARY M. COLLYER
United States District Judge

Date: April 25, 2008

_____

[15] Defendant Dowd made an oral motion for costs at trial.  In general, "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1).  The decision whether or not to award costs rests with the sound discretion of the trial court.  *Cosgrove v. Sears, Roebuck & Co.*, 191 F.3d 98, 101-02 (2d Cir. 1999).  Although Messrs. Dowd and Fisher are not responsible for the March Bill, the Court has found some liability.  The Court will deny Mr. Dowd's motion accordingly.